**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **COLORCON, INC.,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **NO. 11-1700** |
| | : | |
| **AMINAH-IMAN LEWIS and SENSIENT** | : | |
| **TECHNOLOGIES CORP.,** | : | |
| | : | |
| **Defendants.** | : | |

**DuBOIS, J.**                                                        **May 31, 2011**
<u>**M E M O R A N D U M**</u>

## I.  INTRODUCTION

Plaintiff Colorcon, Inc. ("Colorcon") alleges in this action that former employee Aminah-Iman Lewis's new employment at one of Colorcon's competitors, Sensient Technologies Corporation ("Sensient"), violates Lewis's non-competition agreement with Colorcon and makes it likely that Lewis will use Colorcon's trade secrets for Sensient's benefit.  Presently before the Court is Colorcon's Motion for a Preliminary Injunction, which seeks an order barring Lewis from continuing in her current position at Sensient for the duration of the term of her non-competition agreement, approximately 13 months.  The Court held a three-day hearing on Colorcon's motion on March 22, April 5 and April 6, 2011.  The parties subsequently submitted proposed findings of fact and conclusions of law.  In accordance with Federal Rule of Civil Procedure 52(a)(2), the Court incorporates its findings of fact and conclusions of law into this Memorandum.  For the reasons that follow, Colorcon's Motion for a Preliminary Injunction is denied.

## II. FINDINGS OF FACT

### A. Background

#### 1. *The Parties*

Colorcon is a privately held corporation that develops and manufactures colorants and coatings for use in pharmaceutical and food products. (Prelim. Inj. Hr'g Tr. 3/22/11 at 8, 20.) Pharmaceutical coatings and colorants comprise about 95 percent of the company's business, with food and confectionary products constituting the remaining 5 percent. (Id. at 8.) Colorcon is headquartered in Harleysville, Pennsylvania, but sells its products globally. (Id. at 8-9.)

Sensient is a competitor of Colorcon that manufactures colors, flavors and fragrances for use in a variety of products, including food and pharmaceutical products. (Id. at 75; Prelim. Inj. Hr'g Ex. P-31.) Sensient also sells its products worldwide. (Prelim. Inj. Hr'g Tr. 4/6/11 at 156.) One of Sensient's subsidiaries, Sensient Colors, LLC, is a St. Louis, Missouri-based company that works primarily with food colors but includes a unit that develops and sells pharmaceutical coating systems. (Id. at 157, 165.)[1] In July 2010, Sensient announced plans to expand its pharmaceutical coating operations. (Prelim. Inj. Hr'g Ex. P-32.)

For more than 25 years, Sensient supplied Colorcon with dye Colorcon used to manufacture some of its products. (Id. Ex. D-4.) In October 2010, however, Sensient notified Colorcon that it would no longer serve as a Colorcon supplier. (Id.) Colorcon responded by threatening legal action against Sensient. (Id.)

Defendant Lewis is a former Colorcon employee who now works for Sensient in St. Louis.

---

[1] For simplicity, the remainder of this Memorandum will refer only to Sensient, even where the relevant actor is Sensient Colors, LLC.

Lewis was born in St. Louis but grew up in Philadelphia. (Prelim. Inj. Hr'g Tr. 4/5/11 at 166). She attended Prairie View A & M University in Texas, where she graduated in 2000 with a bachelor of science degree, having majored in biology and minored in chemistry. (Prelim. Inj. Hr'g Ex. P-36.) From 2003 to 2010, she worked at Colorcon's West Point, Pennsylvania facility in a variety of technical and sales roles on the food side of the company's business. (Id. Ex. P-16; Prelim. Inj. Hr'g Tr. 4/5/11 at 9; Prelim. Inj. Hr'g Tr. 4/6/11 at 114.) She was terminated by Colorcon on July 8, 2010. (Prelim. Inj. Hr'g Ex. P-2.) After living much of her life in the Philadelphia area, Lewis moved back to St. Louis in December 2010 to commence her employment with Sensient. (Prelim. Inj. Hr'g Tr. 4/5/11 at 166.)

2. *The Technology: Food and Pharmaceutical Coatings and Colorants*

The coloring and coating systems created by companies like Colorcon and Sensient have several functions. Such systems can provide a product with a distinctive color; serve as a barrier to moisture, light or oxygen to enhance a product's shelf life; mask or enhance a particular taste; and control the speed at which and location in the body where a medication is released once it is ingested. (See Prelim. Inj. Hr'g Tr. 3/22/11 at 9-10.)

Much of the evidence presented during the three-day preliminary injunction hearing centered on the level of similarity between coatings and colorants that are used in food and confectionary products and those used in pharmaceutical products. The evidence revealed some commonalties between the two fields. For example, many of the techniques used to apply coatings to one set of products can also be used in at least some applications with the other set of products. (See generally Prelim. Inj. Hr'g Exs. P-4 to P-13.) Much of the technology now employed in food applications was originally developed for pharmaceutical applications.

(Prelim. Inj. Hr'g Tr. 3/22/11 at 16.)

The evidence also showed, however, that there are important distinctions between the two fields. First, the ingredients used in the two products are often different. For example, polyvinyl alcohol ("PVA"), a commonly used ingredient in pharmaceutical coatings, is permitted in food in some countries but banned from use in food in North America. (See id. at 108, 115.) Also, sugar is used frequently in food coatings but rarely in pharmaceutical coatings. (See Prelim. Inj. Hr'g Tr. 4/5/11 at 204; Prelim. Inj. Hr'g Tr. 3/22/11 at 121; Prelim. Inj. Hr'g Ex. D-55; see also Prelim. Inj. Hr'g Ex. P-57; Prelim. Inj. Hr'g Tr. 4/6/11 at 144 (demonstrating that Colorcon's revenue during the years 2008-10 from sugar-based pharmaceutical products amounted to less than 1 percent of its revenue for all pharmaceutical products during those years).)

Second, the overlap noted above in techniques used to apply food and pharmaceutical coatings is relatively minimal. Most sugar-based food coatings are applied using a time-consuming process known as "pan coating." (Prelim. Inj. Hr'g Tr. 4/5/11 at 210.) By contrast, a more rapid process known as "film coating" is more common in the pharmaceutical industry. (Id.)

Third, the profit margins for pharmaceutical coatings are generally higher than the profit margins for food coatings. (See Prelim. Inj. Hr'g Tr. 4/6/11 at 143; Prelim. Inj. Hr'g Tr. 4/5/11 at 105.) Fourth, the time-release function of certain pharmaceutical coatings is inapplicable to food coatings. (See Prelim. Inj. Hr'g Tr. 4/5/11 at 227.) A faulty time-release coating on a pharmaceutical product can injure or kill the consumer. (Id.) Hence, the potential liability exposure for work on pharmaceutical products is substantially greater than for food products. (Id.)

In sum, although food and pharmaceutical coating technologies overlap to a limited

extent, there are important distinctions in the composition of the coatings, how they are applied and the business considerations involved in selling them.

B. <u>Colorcon's Trade Secrets</u>

Colorcon has developed 30,000 total formulations between its food and pharmaceutical products. (Prelim. Inj. Hr'g Tr. 3/22/11 at 21.) A vast array of technical information about these products – from the grade of the raw materials used to the manufacturing processes and equipment employed – is kept confidential. (<u>See</u> Prelim. Inj. Hr'g Ex. P-3 at 12.) The company also keeps confidential customer information, including pricing, and business information, such as budgets, forecasts and financial statements. (<u>See</u> <u>id.</u> Ex. P-3 at 13-14.)

Colorcon uses a variety of methods to keep all of this information confidential. First, the company keeps all the information about its 30,000 formulations in a password-protected database known as FormulaCentral. (Prelim. Inj. Hr'g Tr. 3/22/11 at 30-31.) Second, the company maintains restricted badge access to its laboratories. (<u>Id.</u> at 31.) Third, Colorcon requires employees to sign agreements that include non-competition covenants and covenants not to disclose confidential information. (<u>Id.</u>) Fourth, the company engages in a variety of training programs to make employees aware of the need to maintain the secrecy of confidential information. (<u>Id.</u> at 31-32.) Finally, Colorcon enters into confidentiality agreements with the customers it serves. (<u>Id.</u> at 32-33.)

C. <u>Lewis's Employment With Colorcon</u>

Lewis arrived at Colorcon in July 2003 as a temporary worker. (Prelim. Inj. Hr'g Tr. 4/5/11 at 5.) She worked as a food technologist, producing samples of Colorcon products for the company's food customers. (<u>Id.</u> at 169-70.)

1. *Lewis's Hiring*

In March 2004, Colorcon hired Lewis for a permanent position as a food technologist. (Prelim. Inj. Hr'g Ex. P-16.) Two weeks before she was hired, Lewis received a letter that informed her, <u>inter alia</u>, that she would be required to sign an enclosed employment agreement at her orientation when she started work. (<u>Id.</u> Ex. P-39.) Lewis signed the letter and returned it to Colorcon. (<u>Id.</u>)

Lewis became a permanent Colorcon employee on March 15, 2004. (<u>Id.</u> Ex. P-16.) That day, she signed an employment agreement with the company. (<u>Id.</u> Ex. P-1.) The agreement included the following two pertinent provisions:

> 4. CONFIDENTIAL INFORMATION. Without the COMPANY's prior written permission, I will not, during or after my employment with the COMPANY, use for myself or others, or disclose to others, any formulae, trade secrets, inventions, designs, customer lists or customer information, price lists or pricing information, supplier lists or supplier information, marketing plans or marketing information, financial information, know-how or other private or confidential information of or about the COMPANY which is not already available to the public. . . .
>
> 6. COVENANT NOT TO COMPETE. I agree that for a period of two years after the termination of my employment, whether by resignation or dismissal, with or without cause, I will not either for my own account or business, or for or on behalf of or in the employ of any other person or entity which does business in any geographic location in which COMPANY does business engage directly or indirectly in any work or activity in the same technical areas in which I worked or to which I was exposed during my employment with COMPANY. I further agree that I will not either for my own account or business or for or on behalf of or in the employ of any other person or entity which does business in any geographic location in which COMPANY does business directly or indirectly sell or distribute or attempt to sell or distribute products or services which are the same as, similar to, or competitive with products or services sold or developed by the COMPANY to any customer I contacted or serviced during the three years prior to termination of my employment.

(Id.)  Lewis's assent to the agreement was given "[i]n consideration of my employment by COLORCON."  (Id.)

2. *Lewis's Work at Colorcon*

During approximately the first five years she was a permanent employee at Colorcon, Lewis worked in the company's food group on the technical side of the business.  (Id. Ex. P-16.) She received two promotions during that time.  (Id.)  Then, on January 1, 2009, Lewis became a business development manager, a sales position in which she was responsible for selling Colorcon's food and confectionary products.  (Prelim. Inj. Hr'g Ex. P-16; Prelim. Inj. Hr'g Tr. 3/22/11 at 35.)

In terms of Lewis's job performance, the parties agree that Lewis was a gifted technical employee who excelled in all of her technical positions.  (Prelim. Inj. Hr'g Tr. 3/22/11 at 34-35; Prelim. Inj. Hr'g Tr. 4/5/11 at 28.)  However, Lewis "struggled" in her sales role, according to her supervisor, because she failed to make a sufficient number of sales calls.  (Prelim. Inj. Hr'g Tr. 3/22/11 at 196-98, 222.)

Lewis worked her entire career for Colorcon as a part of the company's food group.  At one point, she requested to move to the pharmaceutical side of the business, but that request was denied.  (Prelim. Inj. Hr'g Tr. 3/22/11 at 125.)  Lewis did have some interaction with the pharmaceutical side of the business, (see Prelim. Inj. Hr'g Ex. P-42), and she and her colleagues in the food group shared office space with members of the pharmaceutical group for much of the time she worked at Colorcon.  (See Prelim. Inj. Hr'g Tr. 4/5/11 at 181.)

However, Lewis's professional interactions with members of the pharmaceutical group

were limited. Much of those interactions consisted of Lewis ordering a color for a colleague in the pharmaceutical group or advising the colleague, based on her experiences with food products, about which color could be used to achieve a desired effect in a pharmaceutical product. (Prelim. Inj. Hr'g Tr. 4/6/11 at 7-12.) The interactions were also rare, numbering fewer than twenty over the course of the more than seven years that Lewis worked at Colorcon, and constituted a small fraction of the work Lewis performed for the company. (Id. at 42; Prelim. Inj. Hr'g Ex. P-42.) The two groups – food and pharmaceutical – did not share weekly technical meetings, and members of the food group were not required (and sometimes not invited) to attend company-wide meetings where pharmaceutical technology was discussed. (Prelim. Inj. Hr'g Tr. 4/5/11 at 197-201.)

Lewis also had only minimal exposure to the manufacturing processes, pricing structures and marketing strategies at Colorcon. (See Prelim. Inj. Hr'g Exs. P-18 to P-21, P-43 to P-50; Prelim. Inj. Hr'g Tr. 4/5/11 at 255; Prelim. Inj. Hr'g Tr. 4/6/11 at 53-56.) There is no evidence Lewis retained copies of any of this or any other confidential information when she left Colorcon. (See Prelim. Inj. Hr'g Tr. 4/5/11 at 261; Prelim. Inj. Hr'g Tr. 3/22/11 at 129.)

      3. *Lewis's Termination*

Colorcon terminated Lewis's employment on July 8, 2010 because of her poor sales performance. (Prelim. Inj. Hr'g Ex. P-2; Prelim. Inj. Hr'g Tr. 3/22/11 at 197-98.) On the day she was terminated, Lewis signed a severance agreement that provided, in pertinent part:

     (a)    General Release of Claims Agreement. You will sign the General Release of Claims Agreement attached as Exhibit A. By doing so, you are releasing any and all claims you might have against the Company and its affiliates and each of their directors, officers, employees and related parties including, without limitation, any and

all claims based on your employment or the termination of your employment (including, without limitation, any and all claims under Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act and state and local discrimination laws. . . .

(g)   Employment Agreement.  You will abide by the terms of the Employment Agreement you signed on March 15, 2004, including without limitation their provisions on inventions, confidential information, restrictions on competition and solicitation and return of all Company documents and other property. . . .

(h)   Non-Disclosure.  In addition to your existing common law obligation to do so and in addition to your obligations under the March 15, 2004 Employment Agreement you agree that all confidential information (whether written, graphic, oral, committed to memory or otherwise in your possession) . . . shall remain strictly confidential and secret so long as that information has not been published in form generally available to the public and you will not use it or disclose it to others.

(Prelim. Inj. Hr'g Ex. P-2 ¶ 9.)  In exchange for these and other promises, Lewis received (1) a severance payment of $20,200, equal to approximately sixteen weeks' salary; (2) a pro-rated bonus payment of $978; (3) two months' of health care coverage paid by Colorcon; (4) an offer of professional outplacement services; (5) a promise not to contest Lewis's application for unemployment benefits; and (6) a promise to provide neutral letters of reference in the future that would not include the fact that Lewis was terminated.  (Id. ¶¶ 2-4, 6-8.)  There is no dispute that Colorcon made the severance payments to Lewis and offered her the promised services.  (Prelim. Inj. Hr'g Tr. 4/5/11 at 24.)

     D.  Lewis's Job Search

     After she was terminated, Lewis began to search for a new job.  She sent her resume out to "hundreds" of potential employers.  (Id. at 124.)  Her search yielded three potential offers.

     First, Lewis was offered a position selling life insurance for Colonial Penn Life Insurance Company.  (Id. at 262.)  She declined that offer because the job would have required her to take

an approximately 70 percent pay cut from the $65,650 a year she earned when she left Colorcon. (Id. at 265; Prelim. Inj. Hr'g Ex. P-16.)

Second, Lewis was offered a job in sales at Mitsubishi Food Ingredients ("Mitsubishi") in Ohio. (Id. at 262.) The position would have entailed Lewis selling colors used in the food industry and assisting customers in using the products. (Id.) Out of concern that the job with Mitsubishi might violate her non-competition agreement with Colorcon, Lewis notified Colorcon of the offer and asked permission to accept the job. (Id. at 264.) Colorcon did not object to Lewis accepting the Mitsubishi offer. (Id.) That decision was based on Colorcon's determination that Mitsubishi was not a competitor, in that, unlike Colorcon, Mitsubishi did not manufacture or formulate products but was only a distributor. (Prelim. Inj. Hr'g Tr. 3/22/11 at 203.) Nonetheless, Lewis declined the offer from Mitsubishi because the company would not pay any part of her expenses to relocate from Philadelphia to Ohio. (Prelim. Inj. Hr'g Tr. 4/5/11 at 264.)

Third, Lewis received an offer, which she ultimately accepted, to work as an inside sales representative at Sensient. (Id. at 268.) Lewis notified both the talent recruiter who initially contacted her about the job and the officials at Sensient with whom she interviewed about her obligations to Colorcon under the employment and severance agreements. (Id. at 265-67.) Lewis did not notify Colorcon of the offer or of her acceptance. (Lewis Decl. ¶¶ 33-35.)

E. Lewis's Job With Sensient

Lewis began working for Sensient in early December 2010. (Prelim. Inj. Hr'g Tr. 4/5/11 at 166.) In her new role as an inside sales representative, Lewis is responsible for servicing small pharmaceutical and nutraceutical accounts from inside Sensient's offices in St. Louis. (Id. at 268; see also Prelim. Inj. Hr'g Ex. D-51.). Though Lewis's job calls for her to do most of her

work on the phone in St. Louis, she has already visited two of her customers in person. (Prelim. Inj. Hr'g Tr. 4/6/11 at 71.) There is no geographic limit on her customer base. (Id. at 171.)

Lewis's position requires her to maintain contact with her customers "for the purpose of identifying customer needs and creating demand for Sensient's pharmaceutical technologies." (Prelim. Inj. Hr'g Ex. D-51.) It does not require her to prepare samples, troubleshoot customers' problems with the coating systems they have purchased or answer technical questions. (Prelim. Inj. Hr'g Tr. 4/5/11 at 268-69.) Those questions are referred to other Sensient employees. (Id. at 269-70; see also Prelim. Inj. Hr'g Exs. D-52 to D53.)

Although Lewis could not recall all of the customers she has contacted for Sensient, she identified six: Farma International, 3M, Florida Supplements, Jamieson Laboratories, Seidler Chemicals and National Vitamin. (Prelim. Inj. Hr'g Tr. 4/5/11 at 140-41, 143.) At least four of those companies are also customers of Colorcon. (Prelim. Inj. Hr'g Tr. 4/6/11 at 76-89.) There is no evidence that any of the companies are among those that Lewis contacted or serviced during the last three years of her employment at Colorcon.

As noted above, prior to accepting her job at Sensient, Lewis made the company aware of her non-competition, confidentiality and non-disclosure obligations to Colorcon. Both defendants state that they are complying with those obligations and will continue to do so in the future. (See Prelim. Inj. Hr'g Tr. 4/6/11 at 40, 160-61.) To that end, Lewis removed one or two customers from the list Sensient originally assigned to her, out of concern that she had contacted them during her last three years at Colorcon. (Id. at 14.) Sensient executives who work on the food side of the business have been told that they are "in no way, shape or form to ever consult with [Lewis], reach out to her, get advice, what have you, that we were going to respect the

noncompete that she had on that point with Colorcon." (Id. at 161.)

Finally, although Sensient has many divisions, there is no evidence before the Court of another job opening at Sensient for which Lewis is qualified. The several open positions identified by plaintiff all require either a type or duration of experience that plaintiff does not possess. (See Prelim. Inj. Hr'g Ex. P-61.)

F. The Current Action

After learning of Lewis's employment with Sensient, Colorcon filed the instant action in the Montgomery County Court of Common Pleas on March 7, 2011. Defendants subsequently removed the action to this Court. The complaint contains four claims: (1) breach of contract against Lewis; (2) tortious interference against Sensient; (3) unjust enrichment against Sensient; and (4) a violation of the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. Cons. St. § 5301 et seq., against both defendants. The parties elected to forego a period of brief discovery and proceeded directly to the preliminary injunction hearing. The hearing was held March 22, April 5 and April 6, 2011. The parties filed their proposed findings of fact and conclusions of law on April 29, 2011. The matter is thus ripe for review.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs district courts' authority to enter preliminary injunctions and temporary restraining orders. Where a plaintiff seeks a preliminary injunction, he must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, 555 U.S. 7, 129 S. Ct. 365, 374 (2008); see also Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 109 (3d Cir. 2010). A preliminary

injunction is an "extraordinary remedy." <u>Winter</u>, 129 S. Ct. at 376.

## IV.  CONCLUSIONS OF LAW

Plaintiff asks the Court to enter a preliminary injunction that would, <u>inter alia</u>, prevent Lewis from continuing in her current position at Sensient.  Defendants respond that such relief is inappropriate because plaintiff has failed to make the requisite showing for any of the four preliminary injunction factors.  The Court concludes that defendants are correct and will address each of the four preliminary injunction factors in turn.

### A.  <u>Likelihood of Success on the Merits</u>

Plaintiff has raised four claims: (1) breach of contract against Lewis; (2) tortious interference against Sensient; (3) unjust enrichment against Sensient; and (4) a violation of PUTSA against both defendants.  Plaintiff has failed, however, to show that it is likely to succeed on the merits of any of the claims.

#### 1. *Breach of Contract*

To prevail on a breach-of-contract claim a party must prove (1) the existence of a contract, (2) the breach of a duty imposed by that contract and (3) damages.  <u>Williams v. Nationwide Mut. Ins. Co.</u>, 750 A.2d 881, 884 (Pa. Super. Ct. 2000).  Although generally enforceable, covenants not to compete "are not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living." <u>Hess v. Gebhard & Co.</u>, 808 A.2d 912, 917 (Pa. 2002).

##### i.  <u>Lewis Is Not Breaching the Employment Agreement</u>

There is no evidence that Lewis has breached her non-disclosure or confidentiality agreements, and the Court finds credible her assurances that she intends to abide by those

agreements.  Moreover, there is no evidence that Lewis has violated or imminently will violate

that portion of her non-competition agreement that bans her from contacting customers she

contacted during her final three years working for Colorcon.  The main dispute, then, is whether

Lewis's job at Sensient violates the portion of her non-competition covenant in which she

pledges not to "engage directly or indirectly in any work or activity in the same technical areas in

which I worked or to which I was exposed during my employment with [Colorcon]."  (Prelim.

Inj. Hr'g Ex. P-1 ¶ 6.)

To resolve that dispute, the Court must first determine what is meant by the phrase

"technical areas."  In this endeavor, the Court is guided by traditional principles of contract

interpretation.  The "fundamental rule" in all contract construction is to "ascertain and give effect

to the intention of the parties."  Huegel v. Mifflin Constr. Co., 796 A.2d 350, 354 (Pa. Commw.

Ct. 2002) (citation omitted).  In ascertaining the parties' intention, a court must read the contract

"as a whole . . . it being necessary to consider every part thereof in order to resolve the meaning

of a particular part as well as that of the whole."  In re Alloy Mfg. Co. Emps. Trust, 192 A.2d

394, 396 (Pa. 1963) (citations omitted); accord Williams v. Metzler, 132 F.3d 937, 947 (3d Cir.

1997) (where a contractual provision is ambiguous, it "must be given an interpretation consistent

with the dominant purpose of the contract.").

Two further rules of contractual construction bear mentioning in this case.  First, because

non-competition agreements restrain an employee's ability to practice his or her chosen trade,

they are "strictly construed against the employer."  All-Pak, Inc. v. Johnson, 694 A.2d 347, 351

(Pa. Super. Ct. 1997) (citation omitted).  Second, "[u]nder the rule of contra proferentem, any

ambiguous language in a contract is construed against the drafter and in favor of the other party if

the latter's interpretation is reasonable." Sun Co. v. Pa. Tpk. Comm'n, 708 A.2d 875, 878-79 (Pa. Commw. Ct. 1998) (citing Restatement (Second) of Contracts § 206).

In this case, plaintiff argues that "technical areas" should be read broadly enough so that food coating and pharmaceutical coating, and sales jobs and technical jobs, are all part of the same "technical area." Defendants counter that food coating and pharmaceutical coating are separate "technical areas" and that the term "technical areas" encompasses only technical jobs, not sales jobs. Defendants have the stronger argument on both issues.

Despite some overlap between the two fields, the Court concludes that food and pharmaceutical coatings are parts of different technical areas. The differences between the two fields – such as ingredients and techniques used and potential for liability exposure – leads inevitably to the conclusion that they are separate technical areas. Based on this conclusion, Lewis's job at Sensient does not run afoul of the non-competition agreement because she is not working in the same technical area in which she worked at Colorcon.[2]

Moreover, to the extent any portions of the non-competition agreement are ambiguous, they must be interpreted narrowly and against the employer and drafter, Colorcon. The Court finds the rationale behind the contra proferentem rule highly relevant to the instant action.

> Where one party chooses the terms of a contract, he is likely to provide more
> carefully for the protection of his own interests than for those of the other
> party. He is also more likely than the other party to have reason to know of

---

[2] The Court did find that Lewis was exposed minimally to the technical aspects of the pharmaceutical side of the business, and the covenant bans work "in the same technical areas in which I worked or to which I was exposed during my employment with [Colorcon]." (Prelim. Inj. Hr'g Ex. P-1 ¶ 6.) However, given the negligible exposure Lewis had to pharmaceutical coating technology, a non-competition agreement that would ban her from technical work in that area would be unenforceable because it would not be narrowly tailored to protect Colorcon's legitimate business interests.

> uncertainties of meaning. Indeed, he may leave meaning deliberately
> obscure, intending to decide at a later date what meaning to assert. In cases
> of doubt, therefore, so long as other factors are not decisive, there is
> substantial reason for preferring the meaning of the other party.

Restatement (Second) of Contracts § 206, cmt. a. In this case, Colorcon had complete control

over the content of the employment agreement Lewis signed. It could have chosen a more

specific phrase than "technical areas." As defendants' interpretation of the bounds of that term is

reasonable – indeed, for the reasons noted above, the Court concludes that it is the more sensible

reading of the covenant – Colorcon must be held to that interpretation.

The determination that Lewis's employment at Sensient does not violate her agreement

with Colorcon is buttressed by the conclusion that the term "technical areas" does not encompass

sales positions. Standing alone, the words "technical" and "area" are relatively vague and

amorphous. Read in the context of the rest of the paragraph in which it appears, however, the

phrase "technical areas" draws a distinction between employees in technical roles and employees

in sales roles.

The second sentence in the non-competition covenant reads, in part:

> I further agree that I will not . . . sell . . . products . . . which are the same as,
> similar to, or competitive with products or services sold or developed by
> [Colorcon] to any customer I contacted or serviced during the three years
> prior to termination of my employment.

(Prelim. Inj. Hr'g Ex. P-1 ¶ 6.) Plaintiff's expansive reading of the ban on working in the same

"technical areas" would render this non-solicitation ban a virtual nullity. Under the first sentence

of the covenant, the employee is already barred from working "in the same technical areas in

which I worked or to which I was exposed during my employment." (Id.) If the phrase

"technical areas" encompasses sales, then any former Colorcon employee who worked with or

sold colorants or coatings would already be banned from taking a position selling them to anyone, including customers contacted in the last three years of employment with Colorcon. The additional ban on selling to recent former customers would be largely superfluous. Courts generally assume that language in a contract was not intended to be "mere surplusage." See Warren v. Greenfield, 595 A.2d 1308, 1313 (Pa. Super. Ct. 1991). Accordingly, although not free from doubt, the Court concludes that the only reason for inserting the non-solicitation provision into the non-competition agreement would be a concern that a former employee who accepts a sales position with another entity would not be working in a "technical area." Thus, in light of the surrounding text, the phrase "technical areas" is best understood as applying only to employees serving in technical roles, not sales positions, such as the one Lewis now holds.

In sum, Colorcon has not shown that it is likely to be able to prove that Lewis is breaching the any of the covenants in her employment agreement. Thus, Colorcon has not established a likelihood of success on the merits of its breach-of-contract claim.

### ii. The Non-Competition Covenant Is Not Enforceable

The Court also concludes that Colorcon cannot establish a likelihood of success on the merits because the non-competition covenant is unenforceable. Because they are disfavored, non-competition agreements are enforced only where they (1) are "incident to an employment relationship between the parties"; (2) impose "restrictions . . . reasonably necessary for the protection of the employer;" and (3) are "reasonably limited in duration and geographic extent." Id. "A restrictive covenant is reasonably necessary for the protection of the employer when it is narrowly tailored to protect an employer's legitimate interests." PharMethod, Inc. v. Caserta, 382 F. App'x 214, 220 (3d Cir. 2010) (emphasis in original).

Moreover, "[i]n determining whether to enforce a noncompetition covenant, [the Pennsylvania Supreme Court] requires the application of a balancing test whereby the court balances the employer's protectible business interests against the interest of the employee in earning a living in his or her chosen profession, trade or occupation, and then balances the result against the interest of the public." Hess, 808 A.2d at 920 (emphasis added).

In this case, the non-competition agreement was incident to the employment relationship between Lewis and Colorcon and reasonable in its length and geographic scope. There is also no question that Colorcon has a legitimate protectible business interest in its wide array of trade secrets. The main dispute between the parties in this case is whether the covenant imposes restrictions "reasonably necessary for the protection of the employer." The Court concludes it is not.

a. *Enforcement Against Terminated Employees Is Disfavored*

Under Pennsylvania law, the determination whether the restrictions imposed by a non-competition covenant are reasonable, and hence enforceable, is a fact-intensive process that differs from case to case. Missett v. Hub Int'l. Pa., LLC, 6 A.3d 530, 538 (Pa. Super. Ct. 2010) Whether an employee leaves his employment voluntarily or is fired is "an important factor" in this analysis. All-Pak, 694 A.2d at 352.

The parties in this case disagree over the weight the Court should give to the fact that Lewis was terminated. To resolve this question, it is useful to understand the factual background of Insulation Corp. of Am. v. Brobston, 667 A.2d 729, 735 (Pa. Super. Ct. 1995), the seminal case in Pennsylvania on the enforcement of non-competition agreements against terminated former employees.

In Brobston, the defendant worked for a company that sold insulation products. When

-18-

the company decided to start selling more technically sophisticated products, Brobston was

required to sign a contract with non-competition and non-disclosure covenants.  Id. at 731-32.

The purported consideration he received was a $2,000 increase in annual pay, as well as training

in a computer system that would help the company develop its specialized products.  Id. at 732.

Brobston never received training to operate the computer system, but he "admittedly

possessed confidential customer sales and profit margin information that related to the system."

Id. at 735.  Throughout his tenure, Brobston "was privy to certain confidential corporate

information such as overhead costs, profit margin, dealer discounts, customer pricing, marketing

strategy and customer contract terms."  Id. at 734.

Brobston was fired for poor sales performance a year after signing the employment

contract.  Id. at 732.  The Superior Court declined to enforce the non-competition agreement

against him.  The court explained:

> Where an employee is terminated by his employer on the grounds that he has
> failed to promote the employer's legitimate business interests, it clearly
> suggests an implicit decision on the part of the employer that its business
> interests are best promoted without the employee in its service.  The
> employer who fires an employee for failing to perform in a manner that
> promotes the employer's business interests deems the employee worthless.
> Once such a determination is made by the employer, the need to protect itself
> from the former employee is diminished by the fact that the employee's worth
> to the corporation is presumably insignificant.  Under such circumstances, we
> conclude that it is unreasonable as a matter of law to permit the employer to
> retain unfettered control over that which it has effectively discarded as
> worthless to its legitimate business interests.

Id. at 735.

Colorcon argues that Brobston should be read narrowly to hold only that an employer

who fires a salesman cannot reasonably argue that it faces a threat to its customer goodwill when

the salesman moves to a competitor firm.  In support of its position, plaintiff cites the following

language in a case from the Middle District of Pennsylvania:

> Courts are skeptical when an employer seeks to enforce a non-compete
> agreement for a terminated employee based only on customer goodwill, as the
> employee's termination suggests that the employer does not find the
> employee to be a competent salesperson and, thus, is not a competitive threat.
> This reasoning is not applicable in this case, as the interests [the employer]
> seeks to protect[, trade secrets,] are unrelated to [the employee's]
> performance.

InterMetro Indus. Corp. v. Kent, No. 07-0075, 2007 WL 1140637, at *7 (M.D. Pa. Apr. 17,

2007) (internal citations omitted).

The Court finds InterMetro inapplicable and its interpretation of Brobston unpersuasive.

First, the employee in InterMetro was not actually fired.  Id.  Thus, any commentary on Brobston

in that case is dicta based on a fact that was not before that court.  Second, the InterMetro court's

reading of Brobston overlooks the fact that Brobston possessed substantial confidential

information of his former employer, including, inter alia, "overhead costs, profit margin, dealer

discounts, customer pricing, marketing strategy and customer contact terms."  667 A.2d at 734.

Although he had no knowledge of how to operate his employer's specialized computer system,

Brobston "admittedly possessed customer sales and profit margin information that related to the

system."  Id. at 735.

The dissent in Brobston recognized that the kind of information Brobston possessed "can

certainly create an unfair advantage in the marketplace."  Id. at 738 (Del Sole, J., dissenting).

Nonetheless, the Brobston court, fully aware that Brobston possessed confidential information

about his former employer, declined to enforce the non-competition agreement because it

determined it would be unreasonable "to permit the employer to retain unfettered control over

that which it has effectively discarded as worthless to its legitimate business interests." Id. at 735.

Based on this language, the Court concludes that Brobston stands broadly for the proposition that enforcement of a non-competition agreement against an employee terminated for poor performance is generally disfavored. As the parties do not dispute that Lewis was terminated for poor performance, this factor weighs heavily against enforcement.

### b. Other Relevant Factors Weigh Against Enforcement

Despite the sweeping language of Brobston, a court errs when it considers only the fact of termination in determining enforceability of a non-competition covenant. Missett, 6 A.3d at 539. To strike the proper balance between the rights of the employee and the employer, courts also ask the following questions:

> What is the situation of employee and his family? What is employee's capacity? Is employee handicapped or disabled in any way? What effect will the restraint have on employee's life? Will it deprive him of opportunity of supporting himself and his family in reasonable comfort? Will it force him to give up the work for which he is best trained or expatriated? What are business conditions? Is there prevailing unemployment? Was the employment terminable at employer's will? Did employee work for employer a very brief time? What were the circumstances of termination of the employment? Did the termination constitute a breach of contract by employer? If not a breach, was it unreasonable? What is the character and extent of consideration to employee?

Id. (citations omitted).

Certain of these factors favor enforcement in this case. For example, there is no evidence that Lewis's termination was in any way wrongful or unreasonable. Further, Lewis worked for Colorcon for about seven years, a relatively substantial period of time.

The Court concludes, however, that the balance of the factors weigh against enforcement.

Importantly, the effect of enforcement could be substantial. As there are no open jobs at Sensient for which Lewis is qualified, she would likely have to be terminated. She would be thrown back into a job market that, as her own difficulty in finding a new position highlighted, remains weak.[3] Many of the jobs for which she is qualified would be foreclosed to her because of the non-competition agreement. Her ability to pay bills, such as her ongoing student loan obligations, would be jeopardized. (See Prelim. Inj. Hr'g Tr. 4/5/11 at 260-61.)

Plaintiff argues that the consideration given to Lewis as part of the severance agreement should also weigh in favor of enforcement. The Court agrees that the approximately $21,000 Lewis received is far from trivial. It is important to note, however, that this consideration was given not just for Lewis's renewed assent to the employment agreement, but also for, inter alia, Lewis's waiver of all potential claims against Colorcon. (See Prelim. Inj. Hr'g Ex. P-2.) Moreover, the consideration Lewis received, while certainly greater than the $2,000 the defendant received in Brobston, is not nearly as generous as the amount given in other cases. See Missett, 6 A.3d at 540 (noting that defendant company had given terminated former employee $300,000 in exchange for agreement not to contact certain former clients.) At most, then, the consideration given in exchange for the severance agreement in this case has a neutral effect on the Court's analysis.

In sum, the Court concludes, based on the evidence before it at this time, that the non-competition covenant is unenforceable. Accordingly, Colorcon has failed to demonstrate a likelihood of success on the merits of its breach-of-contract claim.

---

[3] The national unemployment rate was 9 percent in April 2011. Bureau of Labor Statistics, The Employment Situation – April 2011, at 1 (May 6, 2011), available at http://www.bls.gov/news.release/pdf/empsit.pdf (last visited May 20, 2011).

2. *Tortious Interference*

To succeed on a claim of tortious interference, a party must satisfy four elements:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;
> (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;
> (3) the absence of privilege or justification on the part of the defendant; and
> (4) the occasioning of actual legal damage as a result of the defendant's conduct.

Skiff re Business, Inc. v. Buckingham Ridgeview, LP, 991 A.2d 956, 966 (Pa. Super. Ct. 2010) (citations omitted).

Based on the evidence before the Court, Lewis is not violating any of her obligations to Colorcon in her new position at Sensient. Likewise, there is no evidence that Sensient hired Lewis with the intent to induce Lewis to violate her obligations to Colorcon. Thus, Colorcon has not demonstrated that it is likely to succeed on its claim for tortious interference.

3. *Unjust Enrichment*

In Pennsylvania, a claim for unjust enrichment has three elements: "[1] benefits conferred on defendant by plaintiff, [2] appreciation of such benefits by defendant, and [3] acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." Styer v. Hugo, 422 619 A.2d 347, 350 (Pa. Super. Ct.1993) (quotation marks and citations omitted), aff'd 637 A.2d 276 (1994). The most important element is "whether the enrichment of the defendant is unjust. The doctrine does not apply simply because the defendant may have benefitted as a result of the actions of the plaintiff." Stoeckinger v. Presidential Fin. Corp. of Del. Valley, 948 A.2d 828, 833 (Pa. Super.

Ct. 2008) (quoting Styer, 619 A.2d at 350) (emphasis in original).

Sensient's employment of Lewis is, at least based on the evidence currently before the Court, entirely lawful. So long as Lewis continues to honor her non-disclosure and confidentiality obligations, there will be nothing unjust about any benefit that accrues to Sensient as a result of Lewis's work. Thus, Colorcon has failed to demonstrate that it is likely to succeed on its claim for unjust enrichment.

    4. *PUTSA*

PUTSA defines a trade secret as follows:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. Cons. St. § 5302. A party misappropriates a trade secret when, inter alia, he "acquires knowledge of another's trade secret in circumstances giving rise to a duty to maintain its confidentiality and then discloses or uses that trade secret without the other's consent." Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 110 (3d Cir. 2010) (citation omitted).

PUTSA allows a court to enjoin "[a]ctual or threatened misappropriation of trade secrets." 12 Pa. Cons. St. § 5303(a). A defendant may be enjoined from taking a new position based on the threat of disclosure of a former employer's trade secrets only where the new employment is "likely to result" in disclosure of the trade secrets. Air Prods. & Chems., Inc. v. Johnson, 442 A.2d 1114, 1120 (Pa. Super Ct. 1982).

There is no question that Colorcon possesses extensive trade secrets about its technical

processes, its business operations and its customers.  Moreover, there is no question that, during

the time she was employed at Colorcon, Lewis had access to, and was sometimes exposed to,

those trade secrets, particularly technical information related to food products.  Colorcon has not

shown, however, that it is likely to succeed in demonstrating that Lewis's employment is "likely

to result" in trade-secret disclosure.

At least three factors convince the Court that such disclosure is unlikely.  First, Lewis

worked and accumulated the vast majority of her knowledge about Colorcon on the food side of

the business; at Sensient, she is selling pharmaceutical products.  Second, Lewis has credibly

stated that she does not recall precise formulas from her time at Colorcon.  (See Prelim. Inj. Hr'g

Tr. 4/5/11 at 175.)  The Court deems this statement particularly credible given the five-month

gap between Lewis's termination at Colorcon and her hiring at Sensient and the absence of any

evidence that she took with her copies of any confidential information when she left Colorcon.

Third, Sensient has already taken steps to help ensure that disclosure of confidential Colorcon

information will not occur.  Sensient executives who work on the food side of the business have

been told that they are "in no way, shape or form to ever consult with [Lewis]."  (Prelim. Inj.

Hr'g Tr. 4/6/11 at 161.)  Given that the vast majority of whatever confidential information Lewis

does possess is in the technical aspects of Colorcon's food business, separating Lewis from the

food group at Sensient should eliminate whatever risk of trade-secret disclosure she may pose.

Lewis certainly poses substantially less risk to Colorcon than the defendant in Bimbo

Bakeries.  In that case, the defendant was a high-level executive who was one of only a select few

at the company with access to certain confidential information.  Bimbo Bakeries, 613 F.3d at

105.  In fall 2009, the defendant received and accepted an offer to work for one of the company's

competitors, starting in January 2010.  Id.  He did not tell his current employer about his new job

and continued for several months to work with the same access to highly confidential

information.  Id. at 105-06.  There was strong evidence that the defendant took with him copies

of confidential computer files when he left for his new job.  Id. at 107-08.  The district court

concluded that the defendant's behavior "demonstrate[d] an intention to use [the former

employer's] trade secrets" while working for his new employer and enjoined the defendant's new

employment.  Bimbo Bakeries USA, Inc. v. Botticella, No. 10-0194, 2010 WL 571774, at *13

(E.D. Pa. Feb. 9, 2010).  The Third Circuit affirmed.  Bimbo Bakeries, 613 F.3d at 119.

Unlike the employee in Bimbo Bakeries, Lewis was not a high-level executive at

Colorcon.  She undoubtedly had access to certain confidential information, but there is no

evidence that she was involved in or privy to executive-level decision-making at the company.

More importantly, there is no credible evidence that Lewis took with her copies of any

confidential Colorcon materials or took any action that would indicate she intends to use any

Colorcon trade secrets in her new job.

Plaintiff has shown only that it is possible that Lewis and/or Sensient could

misappropriate Colorcon's trade secrets, not that it is likely.  Accordingly, plaintiff has failed to

demonstrate a likelihood of success on the merits of its PUTSA claim.

B.  Irreparable Harm

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking

preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction."

Winter, 129 S. Ct. at 375 (emphasis in original).  The Third Circuit has stressed that imminence

is a key aspect of this analysis:

> This Court has held that more than a risk of irreparable harm must be
> demonstrated. The requisite for injunctive relief has been characterized as a
> clear showing of immediate irreparable injury or a presently existing actual
> threat; an injunction may not be used simply to eliminate a possibility of a
> remote future injury, or a future invasion of rights, be those rights protected
> by statute or by the common law. . . . [I]njunctions will not be issued merely
> to allay the fears and apprehensions or to soothe the anxieties of the parties.
> Nor will an injunction be issued to restrain one from doing what he is not
> attempting and does not intend to do.

Continental Grp., Inc. v. Amoco Chems. Corp., 614 F.2d 351, 358-59 (3d Cir. 1980) (internal

citations and quotation marks omitted).

Colorcon first argues it has met its burden of showing imminent irreparable harm because

it has proven a breach of an enforceable non-competition agreement. As explained above, the

Court concludes that, at this point in the proceeding, Colorcon has failed to provide sufficient

evidence of either a breach or an enforceable non-competition agreement. Thus, this argument

must fail.

Even if Colorcon had demonstrated such a breach, however, that alone would be

insufficient to meet its burden to show irreparable harm. There is no question that injuries to the

interests protected by enforceable non-competition covenants – customer goodwill, trade secrets

and other confidential information – are the types of injuries that generally are not readily

susceptible to remedies at law. See Quaker Chem. Corp. v. Varga, 509 F. Supp. 2d 469, 478-79

(E.D. Pa. 2007). It is not necessarily true, however, that such an injury will always occur

imminently. The requirement of imminence is important because a preliminary injunction is

issued early in a proceeding, and "[o]nly when the threatened harm would impair the court's

ability to grant an effective remedy is there really a need for preliminary relief. Therefore, if a

trial on the merits can be conducted before the injury would occur there is no need for

interlocutory relief." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice and Procedure</u> § 2948.1 (2d ed. 1995). Hence, a breach of an enforceable non-competition agreement, standing alone, does not necessarily demonstrate the sort of imminent irreparable harm that would justify a preliminary injunction.

In the alternative, Colorcon argues that it has provided separate evidence of imminent irreparable harm. For example, Colorcon points out that Lewis is already contacting customers of Sensient that are also customers of Colorcon. Colorcon has not shown, however, that this contact is wrongful or that it will likely lead to damage of a protectible interest. Given that the Court concludes that Lewis can perform her current job without disclosing Colorcon's confidential information, the only harm that may accrue to Colorcon of her work at Sensient is the normal loss of business associated with fair competition in a free-market system. The Court will not grant injunctive relief on the basis of such harm. <u>Cf.</u> <u>Hess</u>, 808 A.2d at 920-21. ("If the covenant is inserted into the agreement for some other purpose, as for example, eliminating or repressing competition or to keep the employee from competing so that the employer can gain an economic advantage, the covenant will not be enforced.").

Therefore, Colorcon has failed to demonstrate that Lewis's employment with Sensient will likely cause Colorcon imminent irreparable harm.

C. <u>Balance of Equities</u>

The balance of equities tip substantially in defendants' favor. If the Court were to grant the injunction, Lewis would likely lose her job in an uncertain economy. Sensient would likely lose an employee it values. By contrast, on the present state of the record, Colorcon has failed to show that it is likely that Lewis's employment with Sensient is causing Colorcon any

compensable harm.  Therefore, the equities weigh strongly against issuance of the injunction.

    D.  <u>Public Interest</u>

The public interest also favors defendants.  Given the high unemployment rate and Lewis's abilities, it would run counter to the public interest to leave Lewis unemployed or require her to work at a job that does not suit her talents.  Also, given Pennsylvania's historic and continuing hostility to non-competition agreements, it would be contrary to the public interest to enjoin her employment where the Court has already determined that the agreement is not being violated and would not be enforceable if it were.

## V. CONCLUSION

Plaintiff asks the Court to grant an extraordinary remedy (preliminary injunction) to enforce a disfavored contractual provision (non-competition covenant) under circumstances in which enforcement is particularly suspect (termination) based on an expansive reading of a contract it drafted and no evidence of imminent harm.  For the foregoing reasons, injunctive relief is not warranted.  Plaintiff's Motion for a Preliminary Injunction is denied.  An appropriate order follows.